UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
LIBERTY MUTUAL FIRE
INSURANCE COMPANY, as subrogee
of Bollinger Fitness, LLC,

                Plaintiff,

   -against-

BRG SPORTS, INC., and BELL
SPORTS, INC.,

                Defendants.
------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 17-CV-2290 (FB) (LB)

*Appearances:*

*For the Plaintiff:*
MARSHALL T. POTASHNER
GLENN P. BERGER
Jaffe & Asher LLP
445 Hamilton Avenue, Suite 405
White Plains, New York 10601

*For the Defendants:*
C. SCOTT TOOMEY
Littleton Park Joyce Ughetta & Kelly LLP
201 King of Prussia Road, Suite 220
Radnor, Pennsylvania 19087

**BLOCK, Senior District Judge:**

      In 2016 Liberty Mutual Fire Insurance Company ("Liberty") settled a products liability lawsuit against its insured, Bollinger Fitness, LLC ("Bollinger"). It paid $600,000 towards the settlement and, in addition, incurred $137,285 in defending the suit. Liberty then sued Bell Sports, Inc. ("Bell"), and BRG Sports, Inc. ("BRG"), for indemnification in state court. The case was removed to this Court on the basis of diversity.

All parties now move for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, Bell's and BRG's motions are granted, and Liberty's is denied.

I

**A.   Background**

Bollinger has been in the fitness business since the 1970s. In 2002 it sold its business to Bell. Part of the sale included Bollinger's line of resistance bands. Bell developed the bands into two product lines: (1) the "BellFit" line of bands, which Bell itself offered for sale through a variety of outlets, and (2) the "Embark" line, a private label brand developed for and sold exclusively by Target.

***1.   BellFit***

In 2004 Bell added door anchors to its BellFit bands. The anchors allowed the bands to be attached to a door and increased the number of exercises for which the product could be used.

Bell's first door anchors were small blocks of foam. When the company learned that the blocks could slip through door openings, it began using wooden balls, which it referred to as "Generation 1" door anchors. In approximately 2010, Bell introduced "Generation 2" door anchors, which consisted of larger-diameter hollow plastic balls. By 2012 Bell had sold approximately 170,000 BellFit bands with Generation 2 anchors. Only one of those sales resulted in a products liability

claim, which Bell settled for less than $20,000 in March 2012.

### 2. *Embark*

Embark bands were initially sold without door anchors but Target eventually asked that they be added. Although Bell produced the bands and door anchors, Target had final approval over their design. In addition, Target controlled the packaging for its Embark bands, as well as the instructions and warnings that accompanied the product. Although the products differed slightly in size and color, Embark's door anchors were identical to BellFit's "Generation 2" anchors. Target sold approximately 470,000 Embark bands.

In September 2011 Target voluntary recalled its Embark bands after several customer complaints. The recall was registered with the Consumer Product Safety Commission ("CPSC") and listed on the agency's public website. Bell cooperated with the recall but continued to sell its own BellFit bands after obtaining a legal opinion that doing so would not violate the Consumer Product Safety Act. In 2014 the CPSC investigated Bell's decision to continue selling its bands but took no further action.

### B. The Asset Purchase Agreement

In April 2012 Bell sold its BellFit line of resistance bands to Bollinger. The sale was reflected in an "Asset Purchase Agreement" ("APA"), under which Bollinger acquired all intellectual property associated with the BellFit line, as well

as the right to control design changes, packaging and instructions/warnings. Bollinger was aware that BellFit had produced Target's Embark bands, but they were expressly excluded from the sale.

Several provisions of the APA are pertinent here. In Paragraph 1.4, the parties agreed that Bollinger would not assume "Excluded Liabilities," defined as "any Liability of Seller," including liabilities arising from "[a]ccidents, misconduct, negligence, or breach of fiduciary duty occurring on or prior to the Closing Date," Decl. of C. Scott Toomey (Aug. 9, 2019), Ex. E ¶ 1.4(d), or from "[a]ny legal proceeding initiated at any time . . . to the extent related to any action or omission on or prior to the Closing Date," *id.* ¶ 1.4(e). Paragraph 3.1 listed various representations and warranties made by Bell, including statements (1) that the "financial information Seller has provided to Purchaser relating to the Fitness Business was true and correct in all material respects," *id.* ¶ 3.1(c), and (2) that "Seller has complied with all applicable laws, rules and regulations . . . of the city, county, state and federal governments having jurisdiction over Seller, its employees and the Fitness Business," *id.* ¶ 3.1(f). Finally, the parties agreed that Texas law would govern any disputes concerning the APA. See *id.* ¶ 6.6

As part of its due diligence, Bollinger safety-tested the BellFit bands and reviewed the products' packaging, instructions and warnings. It did not, however, check CPSC's website or do any other outside research on recalls. Instead,

4

Bollinger's president emailed Bell's president, Steve Bigelow, the following question in November 2011: "Any product liability issues or claims at present?" Decl. of Marshall T. Potashner (Aug. 9, 2019), Ex. 14. Bigelow responded: "No material product liability issues or claims on bellFit or Savasa products currently we have a handful of very small claims—in the hundreds of dollars." *Id.* (sic). The response made no representation regarding Target's Embark bands.

In March 2014 Bollinger informally recalled its resistance bands; it formally registered a voluntary recall with the CPSC a few months later. At that time, Bollinger's bands included the same "Generation 2" door anchors used by BellFit.

Some time after the APA was consummated, BRG acquired Bell. Although not a party to the APA, BRG agreed to defend and indemnify Bell for any liability arising out of that agreement; BRG's corporate representative stated at his deposition that "BRG is the responsible party for that claim." Dep. of Thom Parks 30.

**C.    The McDonald Lawsuit**

In April 2014—that is, two years after the sale closed—Joseph McDonald filed a tort action against Bollinger in New York Supreme Court. He alleged that he sustained a permanent vision impairment when the door anchor of a Bollinger resistance band dislodged and struck his right eye. He asserted causes of action based on negligence, strict products liability for a design defect, and breach of warranty.

5

Bollinger tendered the defense to Liberty, its liability insurer, which accepted it. It asserted a third-party claim for indemnification against Bell.

McDonald's claim proceeded to trial. Over Bollinger's objection, the trial court allowed McDonald to introduce evidence of Target's recall of its Embark bands based on the similarly of the door anchors used in both product lines. The trial court charged the jury on strict liability for defective design and failure to warn, and on negligence in the testing, evaluation, research and marketing of the bands.

McDonald settled with Bollinger for $650,000 before the jury reached a verdict. Despite Liberty's offer, Bell did not participate in any settlement negotiations or contribute to the eventual settlement. Liberty paid $600,000 and Bollinger (reluctantly) contributed the remaining $50,000.

### D.   The Present Lawsuit

The settlement did not resolve Bollinger's indemnity claim against Bell. In 2017 Liberty asserted that claim in a suit in New York Supreme Court. It also named BRG as a defendant based on its agreement to indemnify Bell. As noted, the defendants timely removed to this Court.

## II

By virtue of its $600,000 payment towards the settlement of the McDonald lawsuit, Liberty is entitled to assert Bollinger's indemnification rights. *See Thoreson v. Thompson*, 431 S.W.2d 341, 347 (Tex. 1968) ("By paying part of

plaintiff's loss, its insurer . . . became a pro tanto owner of the cause of action.").[1]

The question, therefore, is whether Bollinger was entitled to any indemnification from Bell.

In that regard, Liberty invokes two indemnity provisions of the APA. In Paragraph 3.3, Bell promised to indemnify Bollinger from "any and all damages, arising out of, relating to or resulting from:

    (a)    Any breach of a representation or warranty of Seller contained in this Agreement;

    (b)    Any breach of a covenant of Seller contained in this Agreement or in any other Transaction Document; and

    (c)    Any Excluded Asset or Excluded Liability.

APA ¶ 3.3. In Paragraph 5.1, Bell promised to indemnity Bollinger from

    (a)    All liability, loss, damage or deficiency resulting from or arising out of the any inaccuracy in or breach of any representation, warranty, covenant or obligation made or incurred by Seller herein or in any other agreement, instrument or document delivered by or on behalf of Seller in connection herewith; and

---

[1] In arguing to the contrary, Bell cites *Providence Inst. for Sav. v. Sims*, 441 S.W.2d 516 (Tex. 1969), for the proposition that "the general rule [is] that a person who is subrogated to the rights or securities of another may not enforce the same until the claim of the latter against the debtor has been paid in full." *Id.* at 519. Two sentences later, however, the Texas Supreme Court endorsed the exception applicable here: "If the prior creditor consents to pro tanto subrogation of one who makes partial payment, . . . no one else is entitled to object." *Id.*; *see also Fortis Benefits v. Cantu*, 234 S.W.3d 642, 647 (Tex. 2007) ("We do not disagree that equitable and contractual subrogation rest upon common principles, but contract rights generally arise from contract language; they do not derive their validity from principles of equity but directly from the parties' agreement.").

>   (b)  All liability, loss, damage or deficiency resulting from or arising out of the conduct of the Fitness Business by Seller prior to the Closing and during the Transition Period.

APA ¶ 5.1.

These two provisions overlap to some extent, leading Liberty to claim indemnification on four theories:

1. that Bell breached warranties in the APA;

2. that the McDonald suit arose out of an Excluded Liability;

3. that Bell made a misrepresentation in its email regarding product liability claims; and

4. that the McDonald suit arose out of pre-sale conduct.

Each of those theories founders on the same ground. Under Texas law, "the express negligence doctrine provides that parties seeking to indemnify the indemnitee from the consequences of its own negligence must express that intent in specific terms." *Ethyl Corp. v. Daniel Constr. Co.*, 725 F.2d 705, 708 (Tex. 1987). Liberty argues that it is not seeking indemnity for Bollinger's own negligence, but it completely ignores that the Texas Supreme Court has extended the same rule to strict products liability claims. *See Houston Lighting & Power Co. v. Atchison, Topeka & Santa Fe Ry. Co.*, 890 S.W.2d 455 (Tex. 1994); *Dorchester Gas Corp. v. Am. Petrofina, Inc.*, 710 S.W.2d 541 (Tex. 1986). Thus, "parties to an indemnity agreement must expressly state their intent to cover strict

8

liability claims in specific terms." *Houston Lighting & Power Co.*, 890 S.W.2d at 459.

Neither indemnity provision in the APA mentions strict liability or products liability. Liberty attempts to distance its theories of indemnity from products liability, but those attempts are unpersuasive.

It argues that Bell misrepresented its products liability exposure because it did not disclose claims involving Embark bands and Target's voluntary recall of those bands. It argues that this constituted both a breach of Bell's warranty regarding the accuracy of its financial statements and an inaccuracy in a document submitted in connection with the deal. But Bell made no such misrepresentation; its email to Bollinger explicitly described claims against "bellFit or Savasa products" and did not include Embark. Bollinger, undoubtedly aware of the Embark line of bands, did not ask for clarification.

Moreover, although Liberty disputes the number and dollar amount of claims involving Bell's bands, it has not offered any evidence connecting that to its liability to McDonald. Bollinger's president asserts that he would not have bought Bell's fitness business had he known about the Embark recall. He makes no analogous assertion regarding claims involving Bell products.

Finally, Liberty argues that Bell violated the Consumer Product Safety Act ("CPSA") by continuing to see its bands after Target's voluntary recall. The CSPA

9

prohibits the sale of a product that is "subject to voluntary corrective action," 15 U.S.C. § 2068(a)(2)(B); it does not prohibit the sale of products that are similar—or even identical—to recalled products. Indeed, the CPSC investigated Bell's decision and took no action. In the absence of some authoritative determination that Bell violated the CPSA, Liberty cannot establish that Bell misrepresented that it was in compliance with all applicable laws.

### III

In sum, the indemnity provisions of the APA do not cover strict liability claims. To the extent that Liberty attempts to cast its liability to McDonald as something else, it has failed to offer sufficient evidence in support.

Since Bell is not liable to Bollinger, BRG is not,either. In any event, while BRG's agreement to defend and indemnify Bell may have required it to pay a judgment against Bell, it did not give Liberty any direct cause of action.

Accordingly, Bell's and BRG's motions for summary judgment are granted. Liberty's motion is denied. As that disposes of all of Liberty's claims as a matter of law, the Clerk is directed to close the case.

**SO ORDERED.**

    /S/ Frederic Block
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
November 13, 2020